

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-13-475

| | |
|---|---|
| CHARLES SMITH | **Opinion Delivered** February 26, 2014 |
| APPELLANT | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. DR-11-999] |
| V. | |
| CHRISTINA HUDGINS | HONORABLE CRAIG HANNAH, JUDGE |
| APPELLEE | |
| | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Charles Smith appeals from an order of the White County Circuit Court entered on February 7, 2013, awarding custody of the parties' son, D.S., to appellee Christina Hudgins. Charles raises two arguments on appeal. First, he argues that the trial court erred in failing to recuse. Charles also contends that the trial court erred in awarding custody to Christina. We affirm.

On July 20, 2011, D.S. was born out of wedlock to Charles and Christina. The three of them lived together in Benton until Christina moved with the child to Searcy in December 2011. On December 9, 2011, Christina filed a petition for paternity and custody. Christina's petition was filed by her father, Robert Hudgins, who is an attorney.[1] A temporary hearing

---

[1]Charles subsequently filed a motion to disqualify Christina's father as her counsel on the basis that Robert was likely to be a material witness in the case. The record shows that Robert never represented Christina at any hearings, and he signed his last pleading on January 26, 2012. After that, Christina was exclusively represented by another attorney. An

was held on December 14, 2011, wherein Charles waived the requirement of a DNA test and acknowledged paternity. On January 5, 2012, the trial court entered a temporary order finding Charles to be the father of D.S. and awarding temporary custody to Christina. Charles was awarded visitation to include most weekends and one hour each Tuesday and Thursday night. Charles was also ordered to pay child support.

On August 8, 2012, over Charles's objection, the trial court entered an order appointing psychiatrist Charles Spellmann to perform a custody evaluation. Dr. Spellmann conducted psychological evaluations on each of the parties at separate times, and he observed them interact with the child. On September 6, 2012, Dr. Spellmann authored a letter stating:

> Based on my evaluations, it is my opinion that the child will be best cared for by Christina, as she has family members who are available caretakers when needed. Furthermore, the mother is off work during the week and can be a full time mother. A child of this age needs "mothering." He will appreciate "fathering" as he gets older.

On October 23, 2012, Charles filed a motion asking the trial judge, Craig Hannah, to recuse, alleging at least the appearance of impropriety. In his motion, Charles alleged that Christina had told him that she had communicated with Judge Hannah ex parte regarding the issues in the case. Charles claimed to be in possession of an audio recording corroborating this allegation. On November 6, 2012, Christina responded to the motion to recuse, denying having any such conversation with Charles or having any ex parte contact with the judge. The trial court entered an order denying Charles's motion to recuse without comment on November 15, 2012.

---

order relieving Robert as Christina's counsel was entered on May 31, 2012.

SLIP OPINION

The final custody hearing was held over two days on November 28 and December 14, 2012. At the outset of the November 28 hearing, Charles renewed his motion to recuse. Charles testified that he was requesting recusal based on communications by Christina stating that she had talked with the judge after the temporary hearing, and also because of the apparent relationship between Christina's family and Judge Hannah's family. Charles proffered pages from Facebook purporting to demonstrate a friendship between the Hudgins family and the Hannah family, but these documents were ruled inadmissible by the trial court because they had not been provided in discovery. However, Charles was permitted to testify as to what he viewed on Facebook, which included Judge Hannah himself being listed as one of Christina's younger brother Michael's "friends," as well as a comment by Judge Hannah to a hunting picture posted by Michael. Charles also produced documentation that Judge Hannah had appointed Christina's father Robert Hudgins as the executor in an unrelated case, and that the two men were codefendants in a federal lawsuit that was later dismissed. In addition, Charles introduced emails from Christina purporting to show a relationship between her family and Judge Hannah's family. In particular, in response to an email from Charles accusing Christina's father of using his friendship with the judge to get his way, Christina responded, "he's not using his friendship," thereby implying that a friendship existed. In another email, Charles stated that he thought Christina's brother was friends with Judge Hannah's children, and Christina responded that "we aren't doing anything with that family right now."

Christina contradicted Charles and testified that she had not had any communications with Judge Hannah since the case began. Christina further testified that there is no friendship between her father and Judge Hannah, nor is there a friendship between her family and the Hannah family. Christina maintained that she had never socialized with Judge Hannah or his family. The trial court orally denied Charles's motion to recuse, again without comment, and the custody hearing moved forward.

Christina testified that she and D.S. live in a house in Searcy with her parents and younger brother Michael, who is twenty years old. Christina stated that she cares for D.S. every day, bathing and feeding him, and she described D.S. as a very happy baby. Christina stated that while she and Charles were together, she was D.S.'s primary caregiver.

Christina testified that she is currently employed at a nursing home in Searcy. Her hours are from 11:00 p.m. to 7:00 a.m. four or five nights per week, and she said that her mother takes care of D.S. while she is at work.

Christina stated that throughout their relationship Charles had been threatening and physically abusive toward her, and that he beat her both before and during her pregnancy. Christina acknowledged that she and Charles signed an agreement when D.S. was one month old, stating that Charles would have custody of the child. However, she maintained that Charles threatened her with a gun and forced her to sign that agreement against her will. Christina testified that Charles continues to harass her during the visitation exchanges. She also said that when she gets D.S. back from visitation he has wet diapers with dried feces, smells of cigarette smoke, and is hungry.

Christina's father, Robert Hudgins, testified that he attends the visitation exchanges and that Charles videotapes every exchange and does everything possible to make things difficult. On one weekday visitation in March 2012, D.S. had some marks on his head and Charles called the police. Charles refused to give the baby back to Christina until after the police arrived, and the parties had a brief physical confrontation as Christina tried to retrieve the child from Charles. Christina was charged with assault, but the charge was later dropped. A subsequent DHS investigation found no evidence of abuse.

Robert testified that D.S. is very happy and healthy. He said that Christina is an excellent mother and that she raises the child, while other family members are there to help. Robert stated that, prior to the day of the final hearing, they had never needed an outside babysitter for D.S. Robert testified that Christina was eventually planning on moving to another house, but that he loved having her and D.S. at his house and that they were welcome to live there as long as they wanted.

Charles testified that he currently lives in Little Rock and is employed full-time by the Arkansas Army National Guard. Charles works five days a week and occasionally has drill on the weekend. Charles testified that his mother is deceased and his father lives in Texas. Charles stated that he has brothers who live out of state, but he also has a sister living in Sherwood who would be available to help care for D.S. if he were awarded custody. Charles said that he wanted more contact between D.S. and his family.

Charles denied that he ever physically harmed Christina. He acknowledged that there had been violence in their relationship, but he maintained that it was Christina who had



assaulted him. Charles stated that he was asking for custody because he did not believe Christina showed natural maternal instincts or could provide an appropriate home.

Charles testified that he spends every minute he can with D.S., and he said that D.S. "is my world." Charles indicated that he primarily took care of D.S. for the first few months of his life, and stated that he does everything he can do to create a great home and loving atmosphere for the child. Charles also presented the testimony of other witnesses who described him as a great father.

On February 7, 2013, the trial court entered an order establishing paternity, custody, visitation, and child support. The trial court awarded custody of D.S. to Christina, and also ruled that, due to the young age of the child, Charles should be awarded more frequent visitation than would be standard. The trial court awarded visitation to Charles to include every other weekend as well as overnight visitation every Tuesday night until D.S. begins school, at which time Charles will get D.S. on Tuesday evenings until 7:00 p.m. The trial court also ordered Charles to pay child support.

In this appeal, Charles first argues that Judge Hannah should have recused, and that he erred in refusing to do so. He claims that the bias in this case was based upon the relationship between Judge Hannah, appellee's father Robert Hudgins, and the friendship between their respective families.

In support of his argument, Charles raises multiple issues that allegedly put Judge Hannah's impartiality into question. These include the trial court's denial of appellant's motion to dismiss for improper venue at the outset of the litigation; the alleged ex parte



communications between the judge and Christina; the emails from Christina ostensibly indicating some relationship between her family and the judge's family; the Facebook pages demonstrating "friends"; the fact that the judge had appointed Robert Hudgins executor in an unrelated case; the fact that the two men were among the codefendants in a federal lawsuit arising from the events in that case; the fact that Robert Hudgins initially represented Christina in this matter; the judge's appointment of Dr. Spellmann, who had previously received client referrals from Robert Hudgins, to perform a custody evaluation; and the trial court's modification of the temporary visitation schedule over appellant's objection. Charles contends that the appearance of impropriety permeated this case from the beginning, that the above instances demonstrate bias and prejudice, and that Judge Hannah should have recused sua sponte.

Rule 2.11 of the Arkansas Code of Judicial Conduct provides that a judge shall disqualify himself in any proceeding in which the judge's impartiality might be reasonably questioned, including when the judge has a personal bias or prejudice concerning a party or a party's lawyer. A trial judge is presumed to be impartial, and a party seeking disqualification bears a substantial burden to prove otherwise. *Deere v. State*, 59 Ark. App. 174, 954 S.W.2d 943 (1997). A trial court's decision to recuse is within his or her discretion, and we will not reverse absent a showing of an abuse of discretion. *Carmical v. McAfee*, 68 Ark. App. 313, 7 S.W.3d 350 (1999). An abuse of discretion can be proved by a showing of bias or prejudice on the part of the trial judge. *Id*. Absent some objective demonstration by the appellant of the trial judge's prejudice, it is the communication of bias by the trial judge that will cause us



to reverse his or her refusal to recuse. *Id.* The mere fact of adverse rulings is not enough to demonstrate bias. *Id.*

On this record, we hold that Charles failed to meet his burden of demonstrating bias on the part of the trial judge. The trial judge's denial of appellant's motion to dismiss was based on testimony that Christina and D.S. lived in White County and thus that venue was proper, and the fact that the judge ruled against Charles on that issue was insufficient to demonstrate prejudice. The only allegation raised in Charles's written motion to recuse was ex parte communications between Christina and the judge, but Christina denied any such communications and the original CD recording submitted by Charles in support of that allegation was unintelligible. Charles claimed to have an altered recording enhanced by a sound engineer to reduce background noise, but the only copy of the enhanced recording was on Charles's counsel's cell phone, which counsel refused to offer as an exhibit. Moreover, the engineer did not testify and the enhanced recording was not authenticated, nor did appellant produce a transcript of the enhanced recording. Hence, the record is void of any intelligible ex parte communication. Although Facebook pages were proffered giving some indication of an acquaintance between the Hannah and Hudgins families, Christina testified that the families did not socialize and that her father was not friends with the judge. None of the instances identified by the appellant, taken individually or collectively, required recusal in this case. Given the presumption of Judge Hannah's impartiality and the absence of objective proof that he was biased or prejudiced, we conclude that the trial court did not abuse its discretion in refusing to recuse.



Charles next argues that the trial court erred in awarding custody of D.S. to Christina. We, however, do not agree.

Arkansas Code Annotated section 9-10-113(a) (Repl. 2009) provides that an illegitimate child shall be in the custody of its mother unless a court of competent jurisdiction enters an order placing the child in the custody of another party. *Brimberry v. Gordon*, 2013 Ark. App. 473. Section 9-10-113(b) provides that a biological father may petition the court for custody if he has established paternity in a court of competent jurisdiction. *Id.* Custody may be awarded to a biological father upon a showing that (1) he is a fit parent to raise the child; (2) he has assumed his responsibilities toward the child by providing care, supervision, protection, and financial support for the child; and (3) it is in the best interest of the child to award custody to the biological father. Ark. Code Ann. § 9-10-113(c).

In reviewing child custody cases, we consider the evidence de novo, but will not reverse a circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Preston v. Preston*, 2014 Ark. App. 58. We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Id.* This deference to the circuit court is even greater in cases involving child custody, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the child. *Id.*

Charles correctly asserts that he is a fit parent and has assumed responsibilities toward his child. The issue, then, was what was in the best interest of the child. Charles asserts that he showed that it was in D.S.'s best interest to be placed in his custody. Charles relies on

testimony putting Christina's mental stability at issue, as well as Christina's testimony that she would allow Charles no visitation beyond that ordered by the court. Charles also takes issue with the custody evaluation of Dr. Spellmann, and in particular Dr. Spellmann's opinion that due to D.S.'s young age he needed mothering more than fathering. Charles cites *Riddle v. Riddle*, 28 Ark. App. 344, 775 S.W.2d 513 (1989), where we stated that the "tender years" doctrine, whereby a court presumes the mother to be a more suitable custodian of a child of tender years, has been abolished and that custody should be awarded solely in accordance with the best interest of the child without any gender-based preference.

We hold that the trial court did not err in awarding custody to Christina. There was evidence that Christina had been the primary caregiver during D.S.'s life and was able to provide a suitable home with help from family members to care for him. Although the relationship between the parties is acrimonious and Christina is not willing to allow any visitation beyond that ordered by the trial court, the testimony showed that Christina did comply with the court-ordered visitation schedule. And in the order being appealed Charles has been afforded liberal visitation with his child. Although Dr. Spellmann thought that D.S. needed mothering more than fathering, the trial court made no such finding. In both its ruling from the bench and in its written order, the trial court made its custody determination in part based on its finding that Christina had been the primary caretaker, which is a valid consideration in deciding custody. *See Overstreet v. Overstreet*, 2013 Ark. App. 710, ___ S.W.3d ___. On our de novo review of this record, we conclude that the trial court's

findings as to the best interest of the child and its award of custody to Christina were not clearly erroneous or clearly against the preponderance of the evidence.

Affirmed.

GLADWIN, C.J., and VAUGHT, J., agree.

*Miller Miller Churchwell P.L.L.C.*, by: *Joseph Churchwell*, for appellant.

*Robert M. Abney, P.A.*, by *Robert M. Abney*, for appellee.